ORIGINAL

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FILED
JUN 25 2004
U.S. COURT OF FEDERAL CLAIMS

| | |
|---|---|
| OVERSTREET ELECTRIC CO., INC., dba OVERSTREET ENGINEERING & CONSTRUCTION, INC., Plaintiff, v. THE UNITED STATES OF AMERICA, Defendant. | Civil Action No. 04-1067C |

COMPLAINT

Plaintiff Overstreet Electric Co., Inc., dba Overstreet Engineering & Construction, Inc., by the undersigned counsel, files this Complaint against the United States of America, and alleges as follows:

1. Jurisdiction is conferred by 28 U.S.C. § 1491.

2. This action is brought pursuant to the provisions of 41 U.S.C. § 609, and seeks conversion of a default termination of a construction contract between the parties (pursuant to a final decision of the Contracting Officer dated July 29, 2003) to a termination for convenience. Plaintiff also seeks a judgment for damages sustained by Plaintiff due to Defendant's wrongful termination of the contract.

3. Plaintiff, Overstreet Electric Co., Inc., is a Florida corporation with its principal place of business at 4220 N. Davis Hwy., Bldg. B, Pensacola, Florida 32503, doing business as Overstreet Engineering and Construction, Inc.

4. Defendant, the United States of America, acting by and through the Savannah District of the U.S. Army Corps of Engineers awarded the contract that is the subject of this Complaint.

5. The Defendant, by and through the Savannah District of the U.S. Army Corps of Engineers (the "Corps"), issued Solicitation No. DACW21-01-B-0005 on July 18, 2001 for the construction of improvements and replacement of weirs at Disposal Area 12A in the vicinity of Savannah, Georgia.

6. A disposal area is an area of land, usually low-lying and near a body of water, that is enclosed by earthen dikes and into which materials that are dredged from the body of water are placed, usually by hydraulic pumping. Disposal Area 12A was one of a series of such disposal areas along the northern bank of the North Channel of the Savannah River that have been used for many years for the disposal of materials hydraulically dredged from the river channel. Disposal Area 12A consists of approximately 12,900 linear feet of dike enclosing an area of approximately 1,200 acres.

7. The work involved the excavation of material from a borrow area within the disposal area and the placement of the

material on the existing dike to raise and reinforce the structure. Material excavated from the borrow area was also to be used to construct two bird islands, large mounds of earth, within the disposal area. In addition to the earthwork, the work included the replacement of the weir structures that are used to discharge water from the disposal area during dredging operations, and the installation of a computer monitored and operated underdrain system of perforated pipelines laid underneath the disposal area to drain water from the dredged material.

8. Following a public bid opening August 29, 2001, the Defendant awarded Contract No. DACW21-01-C-0007 to Plaintiff on September 13, 2001.

9. The Defendant issued the Notice to Proceed on October 12, 2001. Based on the specified contract duration, the contract completion date was established as August 8, 2002.

10. Delays were experienced in the performance of critical work activities that were beyond the control of, and without the fault or negligence of, the Plaintiff and its subcontractors. These excusable delays were caused by defective specifications, differing site conditions, directed and constructive changes, adverse weather, and the failure to cooperate and active interference by Defendant.

11. Based on the topography and ground elevations provided by Defendant in the contract plans, Plaintiff reasonably anticipated that surface and near surface water within the disposal area would gravity drain to the existing weirs during construction.

12. Based on the representations provided by Defendant in the contract concerning the topography of the disposal area, the character and conditions of the material in the borrow area, and the contract provision that limited the depth of excavation in the borrow area to a depth of two feet, Plaintiff reasonably anticipated that the borrow area could be dewatered by gravity drainage and the material to be excavated would be dry, readily dried if wet, and otherwise suitable for use in the dikes and bird islands.

13. Based on the topography and other representations provided by the Defendant in the contract, Plaintiff reasonably anticipated that almost all of the underdrain system could be installed in the dry using traditional open trench methods of construction, and that underdrain pipelines could be used to drain water from the disposal area during construction.

14. In accordance with the contract, Plaintiff designated the eastern half of the disposal area as the borrow area for the project in its Excavation and Disposal Plan and in its Dewatering Plan, and Defendant approved the designated borrow area.

15. On or about March 15, 2002, Plaintiff learned that the actual ground elevations within the disposal area differed materially from the topography and ground elevations provided in the contract plans. Plaintiff notified Defendant of the difference between the actual elevations and the elevations represented in the plans.

16. Defendant directed Plaintiff to move its excavation of material in the borrow area to the "higher" elevations in the eastern end of the disposal area, and, on or about March 27, 2002, Defendant permitted excavation in the borrow area to exceed two feet in depth but restricted the depth of excavation directly above the underdrain pipelines within the borrow area. On April 26, 2002, Defendant issued Modification P00003 that incorporated this directive into the contract.

17. As a result of the actual ground elevations within the disposal area differing materially from those represented in the plans and specifications and the directives subsequently issued by Defendant, Plaintiff was unable to gravity drain surface and near surface water from the site, and was required to excavate material at elevations lower than anticipated and in a piecemeal procedure.

18. In addition, as Plaintiff commenced the excavation of site drainage ditches and the excavation of material from the borrow area, it found that the material was wetter and

significantly more unstable than anticipated based on the representations in the contract plans and specifications.

19. Based on information and belief, beginning in April, 2002, Defendant permitted other contractors to pump dredge spoils, consisting primarily of water, into the disposal area adjacent to Plaintiff's work area. These operations raised the water level in the adjacent disposal area that was separated from the Plaintiff's work area by a pervious cross dike. These operations resulted in water flowing through and under the cross dike into Plaintiff's work area.

20. Also in March, 2002, Plaintiff connected the partially installed underdrain system to the discharge pipeline through the dike. Water from the disposal area immediately began to flow through the partially installed underdrain system.

21. Although the contract did not require Plaintiff to prevent water from flowing through the underdrain system during construction, Defendant directed Plaintiff to plug the discharge pipeline and preclude any release of water from the underdrain system during construction.

22. Defendant's directive exacerbated the wet and unstable conditions in the project site, and significantly increased the difficulty of the installation of the remainder of the underdrain system and the continuation of the borrow operation.

23. On or about June 11, 2002, Plaintiff notified the Defendant that the project performance was being delayed by the abnormally wet and unstable condition of the borrow and the project site, and by the substantial differences between the ground surface elevations shown on the plans and the actual elevations of the ground surface.

24. On or about July 16, 2002, Plaintiff provided Defendant with a detailed explanation of the impacts on contract performance that were attributable to differing site conditions and defective specifications.

25. On or about September 5, 2002, the Defendant began to assess liquidated damages even though the Defendant knew, or should have known, that the designated borrow area contained insufficient quantities of material meeting the specification requirements for satisfactory fill material and that the Plaintiff was entitled to a time extension.

26. On or about October 15, 2002, Plaintiff notified Defendant that the lack of satisfactory material in the borrow area was impacting the timely performance of the contract work.

27. On or about November 5, 2002, Plaintiff notified Defendant that there was a lack of satisfactory material in the borrow area to support a commercially practicable borrow operation.

28. On or about November 11, 2002, Plaintiff ceased borrow operations and embankment construction due to the lack of a sufficient quantity of satisfactory material in the borrow area to support commercially practicable operations.

29. On November 26, 2002, Defendant issued unilateral Modification P00008 to the contract, acknowledging that the material in the contract borrow area did not meet the specification requirements for embankment fill and directed the use of a different borrow area located approximately five miles from the project site.

30. The problems resulting from the lack of suitable materials in the contractually designated borrow area, that were belatedly addressed by the Defendant in Modification P00008, had plagued the project, and the Plaintiff, from the beginning of the project.

31. The Plaintiff subsequently notified Defendant that performance of the work in accordance with the Defendant's directive contained in Modification P00008 would increase the direct costs of performance by $6.3 million, plus overhead and profit, and would require a contract time extension of 486 days,.

32. On December 31, 2002, after having received the Plaintiff's cost proposal, the Defendant formally suspended the performance of all work associated with unilateral Modification

P00008. Subsequently, on February 13, 2003, Defendant issued Modification P00010 rescinding Modification P00008.

33. On January 13, 2003, the Defendant formally suspended the performance of all embankment work and borrow operations.

34. On May 9, 2003, without prior notice to the Plaintiff, the Defendant issued unilateral Modification P00012 lifting the suspension of work and directing Plaintiff to complete the embankment work using material from the borrow area specified in the contract that had previously been proven to contain insufficient quantities of suitable embankment material and that had resulted in the suspension of work. The modification also provided a 116 day extension of the contract completion date for the period of January 14, 2003 through May 9, 2003 for the suspension of embankment work and borrow operations.

35. Modification P00012 attempted to overcome the admitted lack of suitable materials, the fact that lead to the government-directed suspension of work, by reclassifying as satisfactory material that had been originally classified as unsatisfactory. However, Modification P00012 stated that the material would continue to be unsatisfactory for embankment construction if the materials were "too wet and soft to operate equipment."

36. The sudden lifting of the suspension of work followed an especially wet spring season during which the disposal site continued to settle and became even more saturated with water.

37. During this time, the Defendant continued to use the adjacent disposal area causing water to flow underground into the project site.

38. In the days immediately following the issuance of Modification P00012, Plaintiff attempted to convince the Defendant that before work resumed, a technical meeting should be held to determine whether resumption of the work was feasible, or commercially practical given the continuing wet and saturated condition of the borrow area.

39. On May 20, 2003, the Defendant asked the Plaintiff to provide a new contract completion schedule.

40. On May 27, 2003, a meeting was held with the Defendant to review the project status and to seek the Defendant's agreement to the requested technical meeting. Plaintiff explained that resumption of the work would be very difficult given the continuing wet and significantly unstable conditions and that even an attempted resumption would be wasted effort if a technical meeting resulted in a finding that the project was no longer feasible.

41. Despite the obvious logic in what Plaintiff was suggesting, and despite the Defendant's subsequent agreement to schedule the requested technical meeting, the Defendant nevertheless insisted that Plaintiff resume work even before the meeting took place.

42. On June 5, 2003, Plaintiff responded to the Defendant's earlier request for a new completion schedule by advising the Defendant that it anticipated that the project could not be completed until July 10, 2004.

43. The Defendant did not consider this proposed schedule as acceptable and rejected it on June 17, 2003.

44. On June 20, 2003, Plaintiff requested a 224 day time extension of the contract completion date for the delays, that were beyond the control of and without the fault or negligence of the Plaintiff and its subcontractors, in the performance of critical work activities between November 11, 2001 and November 12, 2002 that were the result of differing site conditions, defective specifications, and directed and constructive changes issued by the Defendant.

45. Plaintiff arranged to rent equipment on an hourly basis and attempted to meet the Defendant's demand for a resumption of work.

46. The continuing and unrelenting rainy weather made any measurable progress impossible, however.

47. On June 27, 2003, the requested technical meeting was held and the Defendant was represented by an outside consultant that it had retained. It was clear, from the outset of the meeting, that the Defendant was in no mood to compromise and that it had already decided to blame the Plaintiff for the inability

to complete the project within the specified performance time, without regard to the field conditions and the weather.

48. On July 7, 2003, the Contracting Officer issued a cure notice requiring a response by Plaintiff within ten days.

49. By letter dated July 16, 2003, Plaintiff responded to the cure notice and proposed a new plan of operation that adopted certain suggestions made by the Defendant. In addition, Plaintiff offered to do everything possible to improve upon its projected schedule and to work cooperatively with the Defendant.

50. In a further demonstration of good faith, Plaintiff met with the Defendant at the site on July 21, 2003 to review the current field conditions and to further explain its plan to resume work.

51. At the July 21, 2003 meeting, Plaintiff orally advised the Contracting Officer that it had arranged to bring additional equipment to the site and that equipment was expected to arrive on or before July 28, 2003.

52. July 28, 2003, a Monday, was proceeded by a weekend of heavy rainfall that resulted in six to nine inches of rain over the Savannah area. Equipment delivery was delayed and, given the weather conditions, equipment delivery would have been difficult and of no immediate value.

53. Apparently angered by what was regarded as Plaintiff's failure to meet its "self-imposed deadline" of July 28, 2003, the

Contracting Officer, without any apparent consideration of the field conditions, or the factors that led to the government-directed suspension of work, terminated the contract for default on July 29, 2003.

54. As of the date of termination, Plaintiff was entitled to extensions of the contract performance time to at least July 10, 2004. The Defendant, through and including contract modification P00013, had granted time extensions amounting to 172 days and had extended the contract completion date to January 27, 2003.

55. As of the date of termination, Plaintiff's failure to proceed with the contract work was beyond the control of and without the fault or negligence of the Plaintiff and its subcontractors.

56. As of the date of termination, the materials in the borrow area continued to be too wet and soft for the operation of equipment and were, in accordance with the contract specifications, unsatisfactory for use in embankment construction.

57. As of the date of termination, Plaintiff was not in anticipatory breach of its contract.

58. As of the date of termination, Plaintiff was willing, and ready, to do everything possible to perform the remaining contract work.

59. The Plaintiff submitted a certified claim pursuant to the Disputes clause in the contract requesting additional money and time to compensate it for the impact of differing site conditions, defective specifications, and the government-directed suspension of work. The Contracting Officer has not yet issued a decision on the claim.

60. At the time of the July 29, 2003, termination for default, the Plaintiff had completed approximately eighty percent of the project and had been paid approximately $3.5 million of the adjusted contract price of $4,356,841.86. Accordingly, contract funds in the amount of approximately $850,000 remained in the hands of the Defendant at the time of the termination for default.

61. On November 3, 2003, the Defendant issued a unilateral contract modification deleting all of the remaining work. There is, therefore, no remaining work to be completed under the contract.

62. The Defendant, after contending that the Plaintiff's failure to complete the project in a timely manner justified a termination for default, failed, prior to the Plaintiff's projected completion date of July 10, 2004 (that the Defendant had rejected) to reprocure the allegedly remaining contract work.

63. The Defendant, acting maliciously, in bad faith, and without just cause, arbitrarily and capriciously terminated the contract for default knowing that field conditions that were not the fault or responsibility of the Plaintiff made contract completion impractical, if not impossible.

64. The Defendant, acting maliciously, in bad faith, and without just cause, arbitrarily and capriciously terminated the contract for default knowing that further contract performance could not be accomplished with available funds.

65. The Defendant, acting maliciously, in bad faith, and without just cause, arbitrarily and capriciously terminated the contract for default knowing that further contract performance was not, in fact, required.

66. The termination of the contract for default failed to give due consideration to differing site conditions, defective specifications, excusable causes of delay, and further failed to give due consideration to the adverse impact on the Plaintiff's performance that resulted from factors that were the fault and responsibility of the government. The termination for default was wrongful, arbitrary, and was an act of bad faith.

WHEREFORE, Plaintiff requests that the Court find that the Defendant's termination of the contract for default was wrongful and should be converted to a termination for convenience, and further requests that the Court enter judgment awarding Plaintiff

damages in accordance with applicable law, plus interest, costs and other such relief as the Court may deem appropriate.

Respectfully submitted,

Dated: 6-24-04

Michael H. Payne, Esquire
Starfield & Payne, P.C.
220 Commerce Dr., Suite 250
Fort Washington, PA 19034
Tel: 215-542-7070
Fax: 215-542-0723

Of Counsel:
Joseph A. Hackenbracht, Esquire
Starfield & Payne, P.C.